

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 6, 2023

**By ECF**
The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Ronald Rogers*, 22 Cr. 321 (JMF)

Dear Judge Furman:

    The defendant in this case, Ronald Rogers, is scheduled to be sentenced on October 12, 2023 at 10:00 a.m., having pleaded guilty to one count of gun trafficking conspiracy, in violation of Title 18, United States Code, Section 371, and one count of gun trafficking, in violation of Title 18, United States Code, Sections 922(a)(1)(A), 924(a)(1), and 2. For the reasons explained below, the Government submits that a sentence of 71 months imprisonment, which is at the top of the United States Sentencing Guidelines range of 57 to 71 months' imprisonment, is warranted in this case.

### I. Factual Background

#### a. Overview

    As set forth in detail in the Presentence Investigation Report (the "PSR"), Ronald Rogers, a resident of the state of Georgia, and his then-wife, Anauncia Rogers, engaged in a scheme to traffic more than 68 firearms from Georgia to New York City. (PSR ¶ 11). More specifically, between at least on or about November 1, 2019, and at least on or about March 25, 2022, Anauncia Rogers, under the leadership of Ronald Rogers, her husband, purchased at least 47 firearms in Georgia—six of which have been recovered during arrests in the Southern District of New York. (*Id.*) Ronald Rogers directed Anauncia Rogers to purchase specific firearms, which he then transported to New York City for sale to others. (*Id.*) But even before Anauncia Rogers joined the conspiracy, and since at least as early as in or about September 14, 2018, Ronald Rogers had been trafficking firearms. (*Id.*)

    While he was engaged in this scheme, Ronald Rogers knew that the firearms he was trafficking to New York City were going to be used by others to commit violent crimes. (*Id.* at ¶ 12). In fact, Ronald Rogers knew that he would make more money when the firearms he sold were going to be used for violence. (*Id.*) For example, on or about January 12, 2021, in a text message conversation with another individual, Ronald Rogers made the following statements, among

others, that show his knowledge and intent: (i) "**lil n**** tj got killed last night** [sic] so now everybody blowing up my phone **like I'm supposed to up n just supply the whole block** for free cuz I'm from over there," (ii) [t]hese kids have no guidance but [shrugging emoji] we live for stuff like this it's sad but **when ppl die bae we benefit**," and (iii) "[i]t is just like any smart business man/woman u know when u gonna make the most money for u its prolly prom holiday n stuff like that **for me it's when ppl die and others want to retaliate [shrugging emoji] cold hearted business ig.**" (*Id.* (emphasis added)). Below are screenshots of those text messages that were obtained from Ronald Roger's cellphone pursuant to a search warrant:



b. **Ronald Rogers Trafficking Firearms Between 2018 and 2019**

Since at least in or about September 14, 2018, Ronald Rogers was trafficking firearms between Georgia, New York City, and elsewhere. (*Id.* at ¶ 13). For example: Ronald Rogers posted on social media a video of law enforcement pulling him over on the road on or about September 14, 2018. He placed a caption on that video stating, "[u] do[n']t kno a hard time until u face one pulled over almost got caught up trafficking 8 guns." *(Id.)* Then, between at least on or about February 18, 2019, and on or about November 17, 2019, Ronald Rogers communicated via text message with several different individuals, including at least one individual using a phone number with a New York City area code, to discuss obtaining and selling firearms and to take orders for firearms. *(Id.)* Examples of those conversations are included in the PSR. (*See id.* at ¶¶ 14-17).

Below are selected screenshots of Ronald Roger's September 2018 social media post and content from iCloud around the same time, all of which was obtained from his iCloud pursuant to a search warrant. The first (left) shows Ronald Rogers bragging about his gun trafficking activity at a time when he is being stopped by police and the second (right) and third (bottom) show some of the firearms that Ronald Rogers likely was trafficking at the time, which appear to include a shotgun and an automatic rifle in addition to multiple handguns:





### c. Gun Purchases Between 2019 and 2022

Starting in or about at least November 1, 2019, Anauncia Rogers joined this gun trafficking conspiracy under the leadership and direction of Ronald Rogers. Between in or about November 1, 2019, and in or about March 25, 2022, Anauncia Rogers purchased at least 47 firearms from seven different federal firearms dealers ("FFLs") in Georgia (the "Gun Purchases"). (*Id.* at ¶ 18).

### d. The Gun Recoveries

Six firearms trafficked by Ronald Rogers to New York City were recovered during the arrests of individuals in the Southern District of New York. For three of those six recoveries, the guns trafficked by Ronald Rogers were found in the hands of two teenagers—a 16-year-old and an 18-year-old—and one 20-year-old. (*Id.* at ¶ 19). In addition, several of these firearms were recovered with short "times to crime," which is a measure of the time between the purchase of a firearm and the recovery of that firearm in a crime, including, for example, one that had an approximately twenty-four-day time to crime and two that had an approximately seven-day time to crime. (*Id.*)

### e. Ronald Rogers Trafficking Firearms Between 2020 and 2022

Between at least in or about January 2020 and at least in or about March 2022, Ronald Rogers repeatedly travelled to New York City, usually by car, to sell or deliver to others the firearms purchased by Anauncia Rogers in Georgia. (*Id.* at ¶ 20). During that period, he took more than 15 separate trips to New York City to deliver firearms to his customers. (*Id.* at 21-48). On most if not all of those trips, Ronald Rogers posted about his trafficking activity on social media and bragged to his followers about the amount of money he was making. (*Id.*) More detail about each of those trips is included in the PSR. (*See id.* at ¶¶ 21-48). Below are some examples of the social media posts and iCloud content from Ronald Rogers during this period, which show the severity and brazenness of his gun trafficking conduct:




*July 2020 (6 firearms including a shotgun)*  *September 2020 (Rogers with 5 Gun Boxes)*


*January 2021 (8 firearms and gloves)*


*February 2021 (Rogers posting threat with firearm)*


*May 2021 (Rogers posting threat with firearm)*


*May 2021 (Rogers posting about his profits)*




*June 2021 (Rogers with 3 firearms and cash)*     *June 2021 (Rogers posting about his profits)*

In addition, below is a compilation of gun trafficking conversations that Ronald Rogers had with customers around March 2020. He created this compilation (top) and then posted a redacted version of it to social media (bottom) bragging about the gun orders he was filling at the time:





### f. Additional Facts About Ronald Rogers Background

In his sentencing submission, Ronald Rogers referred often to the type of husband and father that he is and would like to be as justification for a lesser sentence. While the Government cannot speak to what's in Ronald Roger's mind at this moment, it is aware of facts from his past that undercut the sincerity and validity of his statements, which the Government feels necessary to bring to the Court's attention given the arguments made in his sentencing submission.

First, the Government is aware of evidence establishing that Ronald Rogers was abusive toward his then-wife and co-defendant Anauncia Rogers during their relationship. Below are screenshots from a texts sent by Anauncia Rogers to Ronald Rogers in October 2021 during which Anauncia Rogers expressed her fear about Ronald Roger's domestic violence.



Second, the Government is aware of disturbing photographs and videos obtained from Ronald Roger's iCloud account, at least some of which appear to be material he posted to social media, that show Ronald Rogers bringing firearms around his young children and having his children play with the proceeds of his trafficking. The most disturbing of which shows a daughter of Ronald Rogers playing with what appears to be a firearm and a loaded magazine.




 

## II. The Plea, Guidelines Calculation, PSR, and Defendant's Sentencing Submission

On June 29, 2023, the defendant pleaded guilty to Counts One and Two of the Indictment, pursuant to a *Pimentel* letter, which set forth the Government's view of the applicable Guidelines range as 87 to 108 months' imprisonment, based on an offense level of 29 and a criminal history category of I.

On September 18, 2023, the Probation Department issued its PSR for Ronald Rogers. That report calculated an applicable Guidelines range that was the same as the Guidelines range set forth in the Government's *Pimentel* letter, based on the same offense level and criminal history category. (PSR at ¶ 120). Probation recommends a sentence of 60 months' imprisonment on each count to run concurrently.

Having reviewed the defendant's sentencing submission, the Government agrees with the defense that, in the factual circumstances presented in this case, the Second Circuit's decision in *United States v. Young*, 811 F.3d 592, 601 (2d Cir. 2016) prevents the application of the enhancement for "transferring any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense," as set forth in § 2K2.1(b)(6)(B) of the Guidelines. Accordingly, the Government agrees that the applicable

Guidelines range for Ronald Rogers is 57 to 71 months' imprisonment (the "Guidelines Range"), based on an offense level of 25 and a criminal history category of I.

In his sentencing submission, the defendant has asked the Court for a significantly below-Guidelines sentence of one year and one day imprisonment (Def. Sub. at 2). For the reasons discussed below, the Government believes that a sentence of 71 months imprisonment, which is at the top of the Guidelines Range of 57 to 71 months' imprisonment, is appropriate in this case.

### III. Discussion

#### A. Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B. A Top-of-the-Guidelines Sentence of 71 Months Imprisonment is Necessary and Appropriate

The Government respectfully submits that the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weigh in favor of a 71-month term of imprisonment. The

factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C).

The defendant's decision to lead a conspiracy dedicated to illegally selling nearly 70 firearms placed the City of New York in peril in a very real and serious way. Individuals like the defendant who illegally traffic in firearms are the driving force behind an epidemic of gun violence in New York City. These individuals act with a complete disregard for the danger they create and the lives they put at risk. There are no gun manufacturers in New York City. Guns flow into the city via traffickers, traveling by car, train, plane, and bus from outside the state, often through the "Iron Pipeline" or the "New York Pipeline"[1] — the very pipeline that the defendant traveled along while transporting guns. Lack of access and strict local gun laws, create a black market that allows gun traffickers to sell guns to make quick money, which is exactly what Ronald Rogers did.

The New York Attorney General estimates that 76% of trafficked guns come into New York from seven states including Georgia.[2] These guns fuel violence in the city. In this case, the defendant knew that the firearms he was trafficking were going to be used for violence. His text messages from January 2021 reveal everything the Court needs to know about his state of mind and the seriousness of his offense.

When talking about his gun trafficking enterprise, Ronald Rogers acknowledged that the guns he trafficked were going to be used by his customers to retaliate violently against others. He also acknowledged that he made more money because his guns were used in violence—or, as he put it, "when ppl die." In a cold and remorseless fashion Ronald Rogers wrote the following: "[i]t is just like any smart business man/woman u know when u gonna make the most money for u its prolly prom holiday n stuff like that **for me it's when ppl die and others want to retaliate [shrugging emoji] cold hearted business ig**." (emphasis added).

The defendant was an arms dealer. Plain and simple. As is clear form his text messages, his customers were gang members, and his victims were everyone else living in the communities where those gang members operated. His victims were people who live in fear of themselves or their children being caught in the wrong place at the wrong time or being hit by a stray bullet. He may not have pulled any triggers himself, but he injected score of guns into communities knowing that someone else was going to use them.

What is equally devastating is that the guns Ronald Rogers trafficked got in the hands of teenagers. Only six of the firearms trafficked by Ronald Rogers to New York City have been recovered, which means that, in all likelihood, over 60 firearms still remain out in the community. For three of the six guns recovered, though, the guns trafficked by Ronald Rogers were found in the hands of two teenagers—a 16-year-old and an 18-year-old—and one 20-year-old. This is one

---

[1] www.documentcloud.org/documents/21185516-nyc-mayors-blueprint-to-end-gun-violence.

[2] https://targettrafficking.ag.ny.gov/. *See also* Most Guns Used to Commit Crimes in New York Were Bought in Other States, Report Finds – NBC New York

of the tragic realities of gun trafficking and gun violence in New York City. Kids who couldn't otherwise obtain guns get guns from gun traffickers like Ronald Rogers.

Ronald Rogers is also not a man who had a one-time lapse in judgment as a result of dire financial straits. Instead, he is a man who enthusiastically, brazenly, and repeatedly participated in the illegal trafficking of firearms. He engaged in this conduct for almost four years and trafficked nearly 70 firearms. He also boasted about his conduct and the profits he made, amplifying the effect of his crimes over social media. He showed no remorse whatsoever during the life of his conspiracy. And while he appears to show remorse now, that remorse comes at no cost to him now and will do nothing to get back the guns he trafficked.

The defendant spends a significant portion of his sentencing submission discussing his difficult background and his compliance with his conditions of pre-trial release. With respect to his background, the Government is sympathetic to the difficulty of Ronald Rogers's upbringing. No one should ever have to face the violence that Ronald Rogers did when he was just a teenager or live with its lingering effects. But it is that experience—being the victim of a shooting himself—that underscores the seriousness of his criminal conduct. Ronald Rogers knew the consequence of his crime, but deliberately ignored them. Rather than take his own difficult life experience and use it to better his community, he continued to fuel the cycle of violence. This fact is not a mitigating factor, it is an aggravating one.

With respect to his behavior on pre-trial release, the Government acknowledges that Ronald Rogers has been complaint with his conditions. But compliance with pre-trial conditions, which is a baseline expectation of anyone released on bail in this District, does not mitigate the dangerous conduct that Ronald Rogers engaged in for nearly four years before that. The Government also commends Ronald Rogers on wanting to be a good father and husband. And while the Government hopes that he can accomplish those goals, the Government has reason to doubt the sincerity of his statements. As detailed above, the Government is aware of evidence establishing (i) that Ronald Rogers was abusive toward his then-wife and co-defendant Anauncia Rogers during their relationship and (ii) that he endangered is own children by exposing them to his cache of firearms.

The defendant's criminal conduct cannot be taken lightly. At a time when gun violence is so prevalent, the need for general deterrence is particularly striking. *See United States v. Cavera*, 550 F.3d 180 (2d. Cir. 2008) (considering the district court's decision to consider New York market conditions in order to accomplish the goal of general deterrence in a gun trafficking case and holding no abuse of discretion). A top-of-the-Guidelines sentence of incarceration would send a message to the defendant and others like him, that his criminal behavior will not be tolerated. It is also consistent with other sentences being given for gun trafficking in this District. *See United States v. Wilson et al*, 21 Cr. 249 (S.D.N.Y.) (Stein, J.) (in gun trafficking conspiracy involving at least 89 firearms, sentencing the two leaders of the conspiracy to 120 months' imprisonment and other highly culpable co-conspirators to sentences including 60 and 48 months' imprisonment).[3]

---

[3] The two cases cited in the defendant's submission for the proposition that a sentence of one year and one day is appropriate in this case are not useful comparisons. In *United States v. McCray*, 18 Cr. 34 (S.D.N.Y.) (Torres, J.), the defendant was alleged to have trafficked around ten guns, and

**IV. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a top-of-the-guidelines sentence of 71 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Matthew J. King/Adam Sowlati
Assistant United States Attorneys
(212) 637-2384

cc: Ian Marcus Amelkin, Esq. (by ECF)

---

in *United States v. Hall*, 21 Cr. 643 (S.D.N.Y.) (Carter. J.), the defendant was alleged to have trafficked between three and seven firearms. Ronald Rogers, on the other hand, led a conspiracy that trafficked nearly 70 guns.